FILED
2012 Oct-17  PM 04:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **WALTER ENERGY, INC. and** | ) | |
| **JIM WALTER RESOURCES, INC.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No.** |
| | ) | |
| **v.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **NATIONAL UNION FIRE** | ) | |
| **INSURANCE** | ) | |
| **CO. OF PITTSBURGH,** | ) | |
| **PENNSYLVANIA,** | | |

### Defendant.

## COMPLAINT

Walter Energy, Inc. and Jim Walter Resources, Inc. (collectively, "Walter

Energy"), by and through their attorneys, Maynard Cooper and Gale, PC and Reed Smith LLP,

state as their Complaint against National Union Fire Insurance Company of Pittsburgh,

Pennsylvania ("National Union") as follows:

## I.  NATURE OF THE ACTION

1.      This is an action for declaratory judgment, breach of contract and bad faith arising

out of the refusal of defendant, National Union, to provide insurance coverage to Walter Energy

for underlying environmental property damage and related costs as required by the insurance

policy purchased by Walter Energy.

2.      On July 15, 2011, a containment tank at the R-17 slurry injection well at Walter

Energy's North River Mine overflowed (the "Slurry Spill").  Coal slurry was discharged into an

unnamed tributary and Freeman Creek, which flows into the North River.  Walter Energy

immediately commenced remediation of the Slurry Spill.  Walter Energy incurred millions of

dollars in expenses in the clean up and remediation of the Slurry Spill, and in monitoring and testing of the affected waters.

3.      National Union sold a Commercial Umbrella Liability Policy to Walter Energy which contains a specifically-tailored endorsement to provide insurance coverage for expenses incurred with respect to environmental incidents like the one at the North River Mine and the subsequent clean up and remediation of the spill.  Nevertheless, National Union refuses to honor its obligations under the Policy.

4.      Walter Energy seeks a declaration that the terms of the Policy obligate National Union to pay costs incurred in remediating the Slurry Spill.  Walter Energy also seeks monetary damages for the National Union's breach of the Policy and its bad faith denial of its obligations under the Policy.

## II. PARTIES

5.      Walter Energy, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 3000 Riverchase Galleria, Birmingham AL 35244-2378.

6.      Jim Walter Resources, Inc., a subsidiary of Walter Energy, Inc., is a corporation existing under the laws of the State of Alabama, with its principal place of business at 16243 Highway 216, Brookwood, AL 35444.

7.      Upon information and belief, National Union is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 175 Water Street, New York, NY 10038.

US_ACTIVE-108835155.3-JFHEINNI

### III. JURISDICTION AND VENUE

8.      The subject matter jurisdiction of this Court is based upon 28 U.S.C. § 1332, in that there is complete diversity of citizenship among the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391, in that a substantial part of the events giving rise to this action occurred in this District.

### IV. BACKGROUND

10.      Walter Energy operates a coal mining operation at the North River Mine. The North River Mine is located in Fayette and Tuscaloosa Counties in Alabama.

11.      Walter Energy purchased the North River Mine from Chevron in 2010.

12.      The North River Mine is principally used for mining and processing coal.

13.      To process the coal, Walter Energy operates a coal preparation plant, which is a facility that washes coal of soil and rock.

14.      The by-product from processing the coal is referred to as "coal slurry." The coal slurry is approximately seventy-five percent water and twenty-five percent fine rock particles left behind by the coal processing.

15.      Injecting coal slurry into vacated sections of the mine several hundred feet below the ground is an approved method for handling slurry.

16.      Walter Energy has a permit to inject the slurry into vacated sections of the North River Mine. The solids settle out and the majority of the water is reused in the mining process. The injection and reuse of the water is an integral part of the mining process.

17.      To accomplish this, the coal slurry is pumped from the coal preparation plant to injection wells located on the surface. The wells connect to vacated underground areas of the

- 3 -

North River Mine. After the solids settle out, the water is pumped to the surface for use in the preparation plant.

18.     One of these injection wells was the R-17 injection well located in Berry, Alabama.

19.     The R-17 injection well contains a pipe running from the surface to a vacated mined cavity approximately six-hundred feet below the surface.

20.     The R-17 injection well also has a containment tank, which is a back-up system designed to do what its name says – contain any overflow from the well.  In the event that the underground pipe becomes clogged or backed up, the coal slurry flows into the containment tank.

21.     The containment tank was equipped with a "float switch." When the slurry in the tank reaches a certain level, the float switch activates and stops the flow of the coal slurry to the R-17 injection well.

22.     This automatic shutdown system was tested quarterly, and the tests revealed that it was in proper working condition in May, 2011.

23.     On July 15, 2011 at 6:15 a.m., the day shift at the coal processing plant began and pumping commenced to the R-17 injection well.

24.     At 11:25 a.m., a delivery truck driver called a mine operator at the North River Mine and reported that the overflow tub at the R-17 slurry injection well was running over and spilling out onto the ground.

25.     Flow of the coal slurry to the R-17 injection well was shut down at approximately 11:30 a.m.

US_ACTIVE-108835155.3-JFHEINNI

26.     It was later determined that the pipe to the underground cavern plugged, causing the coal slurry to discharge into the containment tank.  The float switch in the containment tank malfunctioned, causing the automatic shutdown system to fail.

27.     An undetermined amount of coal slurry was released into an unnamed tributary of Freeman Creek and Freeman Creek, which eventually flows to the North River.

28.     Walter Energy employees made an initial assessment of the Slurry Spill between 12:00 p.m. and 1:00 p.m.  Also at that time, an excavating contractor was mobilized to the R-17 injection well.

29.     At 1:00 p.m., Walter Energy contacted the Alabama Surface Mine Commission ("ASMC") Inspector.  Walter Energy also mobilized two Safety Kleen vacuum trucks to the R-17 injection well.

30.     Shortly after, Walter Energy notified the Alabama Department of Environmental Management ("ADEM").

31.     Later in the day, after consultation with the ASMC Inspector, Walter Energy scheduled four contractors for 24 hour per day clean up activities.

32.     On July 16, 2011 at 7:30 am, ten vacuum trucks commenced clean up at strategic locations between the R-17 injection well and the North River.

33.     Walter Energy also commenced various other clean up activities including, but not limited to, the installation of multiple rock filter dams, floc logs, floating silt screens, and hay bale filter barriers ("Clean Up Equipment") to capture slurry fines.

34.     Walter Energy also conducted numerous tests of the water quality in the affected tributaries.

35.    Due to the prompt and diligent efforts of Walter Energy and its contractors, in October of 2011, the clean up and remediation of the Slurry Spill was completed and the clean up equipment was removed.  The banks of the effected tributaries were seeded and re-stabilized.

36.    Walter Energy expended several millions of dollars in the clean up and remediation of the Slurry Spill, and in monitoring and testing of the affected waters.

## V. **THE POLICY**

37.    National Union sold a Commercial Umbrella Liability Policy, number BE 21446431 (the "Policy"), with a policy period from January 31, 2011 to January 31, 2012 to Walter Energy.  The Policy is attached as Exhibit A hereto, and is incorporated herein by reference.

38.    Walter Energy, Inc. is the Named Insured on the Policy and Jim Walter Resources, Inc. is a Named Insured under the Policy's definition of Named Insured.

39.    The Policy has limits of liability of $23,000,000 per occurrence and in the aggregate.

40.    The Policy's insuring agreement provides:

We will pay on behalf of the **Insured** those sums in excess of the **Retained Limit** that the **Insured** becomes legally obligated to pay as damages by reason of liability imposed by law because of **Bodily Injury, Property Damage** or **Personal Injury and Advertising Injury** to which this insurance applies or because of **Bodily Injury** or **Property Damage** to which this insurance applies assumed by the **Insured** under an **Insured Contract**.

See Policy § I(A).

41.    The Named Peril and Time Element Pollution Self-Insured Retention Endorsement (the "Time Element Endorsement") amends the Policy's Pollution Exclusion contained in Policy § V(Q), and provides:

This insurance does not apply to:

- 6 -

US_ACTIVE-108835155.3-JFHEINNI

1. Any **Bodily Injury, Property Damage** or **Personal Injury and Advertising Injury** arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **Pollutants** anywhere at any time;

2. Any loss, cost or expense arising out of any request, demand, order or statutory or regulatory requirement that the **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **Pollutants**;

3. Any loss, cost or expense arising out of any claim or **suit** by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of **Pollutants**.

However, Paragraph 1 of this exclusion will not apply to **Bodily Injury** or **Property Damage** arising out of:

. . .

iii. Any discharge, dispersal, seepage, migration, release or escape of **Pollutants** that meets all of the following conditions:

> (a) It was accidental and neither expected nor intended by the **Insured**. This condition would not serve to deny coverage for a non-routine incident where such discharge, dispersal, seepage, migration, release or escape of pollutants was a result of an attempt by the **Insured** to mitigate or avoid a situation where substantial third party **Bodily Injury** or **Property Damage** could occur;

> (b) It was demonstrable as having commenced on a specific date during the **Policy Period**;

> (c) Its commencement became known to the **Insured** within (20) calendar days;

> (d) Its commencement was reported in writing to us within (80) calendar days of becoming known to any officer of the **Insured**; any manager in your risk management, insurance, or legal department; any employee who was authorized by you to give or receive notice of an **Occurrence**, claim or Suit; or any **Insured** authorized or responsible to report the commencement; and

> (e) Reasonable effort was expended by the **Insured** to terminate the discharge, dispersal, seepage, release or escape of Pollutants as soon as conditions permitted.

However, nothing contained in this endorsement will operate to provide any coverage with respect to:

- 7 -

(i) Any site or location principally used by the **Insured**, or by others on the **Insured's** behalf, for the handling, storage, disposal, dumping, processing or treatment of waste material. . . .

See Policy, Endorsement 18.

42.    The Policy contains the following relevant definitions:

**Property Damage** means:

> 1. physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use will be deemed to occur at the time of the physical injury that caused it; or
>
> 2. loss of use of tangible property that is not physically injured.  All such loss of use will be deemed to occur at the time of the **occurrence** that caused it.
>
> . . .

**Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

See Policy §§ VII(Y) & (W).

## VI.    THE HISTORY OF POLLUTION EXCLUSIONS AND INTERPRETATION BY ALABAMA COURTS

43.    In or about 1940, the insurance industry developed the first standard form comprehensive general liability insurance policy, which covered all risks known and unknown other than those expressly excluded.

44.    Specifically, E.W. Sawyer, an attorney for the National Bureau of Casualty and Surety Underwriters, stated in The Casualty Insurance Educator, which was an insurance industry publication prepared in the early 1940's to educate underwriters, that:

> Within the limitations established by the standard exclusions, it is obvious that the policy covers all hazards of liability loss whether such hazards are or are not known to exist.  The significance of this radical change from past practices lies in the fact that the insurer assumes the burden of discovering and charging premium for all hazards, and provides insurance against such hazards whether or not they are discovered.  No longer is the insurance limited to

- 8 -

> hazards for which the insured has asked protection and paid
> premiums. The hazards embraced by the comprehensive general
> liability policy are, therefore, not only the known hazards but the
> unknown hazards.

E.W. Sawyer, Comprehensive Liability Insurance The Casualty Insurance Educator 29

(Woodhull Hay ed., Ser. III 1943).

45.     Representatives of the insurance industry marketed the new standard form

comprehensive general liability insurance policy stressing its coverage for all risks known and

unknown and not expressly excluded as a major benefit to the policyholder.

46.     The standard form comprehensive general liability insurance policy was revised

without material change in 1943, 1947 and 1955.

47.     During the period from approximately 1940 to 1966, the standard form

comprehensive general liability insurance policy covered, and was widely interpreted to cover,

bodily injury and property damage caused by an "accident," including continuous or repeated

exposure to conditions over an extended period of time.

48.     Beginning in the early 1960's, insurance companies, acting through industry trade

associations developed a new standard form comprehensive general liability insurance policy.

49.     As a result, a new standard form comprehensive general liability insurance policy

became effective on October 1, 1966. The new standard form comprehensive general liability

insurance policy provided, in pertinent part, as follows:

> The company will pay on behalf of the policyholder all sums
> which the policyholder shall become legally obligated to pay as
> damages because of
>
> (a)  bodily injury, or
>
> (b)  property damage
>
> to which this insurance applies, caused by an occurrence.

- 9 -

50.     The 1966 version of the standard form comprehensive general liability insurance

policy defined "occurrence" as:

>       an accident, including injurious exposure to conditions, which,
>       results, during the policy period, in bodily injury or property
>       damage neither expected nor intended from the standpoint of the
>       policyholder.

51.     In approximately 1973, the insurance industry changed the definition of

"occurrence" to read as follows:

>       an accident, including continuous or repeated exposure to
>       conditions, which results in bodily injury or property damage
>       neither expected or intended from the standpoint of the
>       policyholder.

52.     Insurance industry trade associations first developed and adopted a "pollution

exclusion" endorsement for mandatory use in standard form Comprehensive General Liability

Insurance Policies in 1970.  This exclusion is referred to as the "Qualified Pollution Exclusion."

The Exclusion provided as follows:

>       This insurance does not apply to bodily injury or property damage
>       arising out of the discharge, dispersal, release or escape of smoke,
>       vapors, soot fumes, acids, alkalis, toxic chemical, liquids or gases,
>       waste materials or other irritants, contaminants or pollutants into or
>       upon land, the atmosphere or any watercourse or body of water;
>       but this exclusion does not apply if such discharge dispersal,
>       release or escape is sudden and accidental.

53.     Under the terms of the limited "pollution exclusion," coverage is provided for

"discharge, dispersal, release or escape" that is "sudden and accidental."

54.     Under Alabama law, the Qualified Pollution Exclusion has been repeatedly

construed in favor of coverage.  See, e.g., Ala. Plating Co. v. U.S. Fid. & Guar. Co., 690 So.2d

331, 335-36 (Ala. 1997); Assoc. Scrap Metal, Inc. v. Royal Globe Ins. Co., 927 F.Supp. 432, 438

(S.D. Ala. 1995) (same); Essex Ins. Co. v. Avondale Mills, Inc., 639 So.2d 1339, 1342 (Ala.

US_ACTIVE-108835155.3-JFHEINNI

1994); <u>U.S. Fid. & Guar. Co. v. Armstrong</u>, 479 So.2d 1164, 1168 (Ala. 1985); <u>Molton, Allen & Williams, Inc. v. St. Paul Fire & Marine Ins. Co.</u>, 347 So.2d 95, 99 (Ala. 1977).

55.     In <u>Alabama Plating</u>, the Alabama Supreme Court ruled that the Qualified Pollution Exclusion was ambiguous, specifically the term "sudden." The Court determined that insurance industry's intent in adopting qualified pollution exclusion was to clarify that policies excluded coverage for intentional polluters and thus narrowly interpreted the Qualified Pollution Exclusion.

56.     In <u>Associated Scrap Metal,</u> an Alabama federal court reached a similar conclusion. The Court determined that there was no distinction between gradual and non-gradual pollution, and that the "sudden and accidental" language in the exclusion merely clarified that the damage was unexpected and unintended. In reaching its decision, the court noted that "exceptions to insurance coverage are to be construed as narrowly as possible in order to provide maximum coverage for the insured, and such clauses must be construed most strongly against the company that issued the policy."

57.     The Alabama Supreme Court again interpreted the Qualified Pollution Exclusion in favor of coverage in <u>Essex</u>, this time when construing the term "atmosphere." The Court stated that "[i]nterpreting that term 'as narrowly as possible to provide maximum coverage for the insured . . . we hold that the term 'atmosphere' as it is used in this exclusion does not include the 'internal environs or surroundings of individual buildings' and that the trial court therefore properly held that the 'pollution exclusion' does not apply in this case."

58.     In <u>Molton</u>, the Alabama Supreme Court determined that the Qualified Pollution Exclusion was "not free of ambiguity." The Court determined that the Exclusion was "intended to cover only industrial pollution or contamination," and did not apply to the washing of sand

US_ACTIVE-108835155.3-JFHEINNI

down streams and into lakes  The Court took into consideration the policyholder's reasonable expectations, and stated that "[w]e do not believe that the insured real estate developer, by reading the exclusion clause would reasonably expect that the alleged damage caused by its construction activity would be included in the descriptions set out in the 'pollution exclusion' clause."

59.    Following the reasoning in Molton, the Alabama Supreme Court in Armstrong refused to apply the Qualified Pollution Exclusion to the seepage of raw sewage from a municipal sewer system.

60.    In 1986, the insurance companies attempted to draft form exclusions designed to preclude coverage for pollution related liabilities, without regard to how the pollution was caused or by whom it was caused.  These exclusions are often referred to as the "Total Pollution Exclusion."

61.    The Pollution Exclusion in the Policy form is a version of the Total Pollution Exclusion.

62.    However, recognizing the substantial market for companies wishing to purchase insurance coverage for certain environmental risks, many insurance companies, including National Union, began to provide environmental coverage by removing these broad exclusions by endorsements that reinstate coverage for certain environmental risks that businesses like Walter Energy face.

63.    A specific example of these types of endorsements is National Union's Time Element Pollution Endorsement that is part of the National Union Policy here.

64.    The Time Element Pollution Endorsement removed the Total Pollution Exclusion in the Policy, and provided coverage for release of pollutants that was "accidental and neither

US_ACTIVE-108835155.3-JFHEINNI

expected nor intended by the **Insured** . . . ," subject to certain other reporting requirements in the Endorsement.

65.     Thus, the Time Element Endorsement converts the Policy's total pollution exclusion into a limited pollution exclusion subject to certain reporting requirements.

## VII.   NATIONAL UNION'S BAD FAITH DENIAL OF THE CLAIM

66.     On July 21, 2011, six days after the Slurry Spill, Walter Energy provided notice to National Union of the Slurry Spill (the "Claim") through its insurance broker, the Willis Group.

67.     On September 2, 2011, National Union, through its claims administrator Chartis, denied coverage for the Claim.

68.     National Union conceded that the Claim fell within the insuring agreement of the policy.  Despite the fact that the North River Mine Property is principally used for mining and processing coal, Nation Union contended that the Claim is excluded under the Time Element Endorsement's exclusion for "[a]ny site or location principally used by the **Insured** . . . for the handling, storage, disposal, dumping, processing or treatment of waste material."

69.     Specifically, National Union contended that "under no circumstance does the [Time Element] endorsement provide any coverage with respect to any site or location principally used by Walter Energy for the handling, storage, disposal, dumping, processing or treatment of waste material . . . As the overflow tub is used for the storage of waste, and is situated at a location that is principally used for that purpose, this endorsement does not afford coverage for the resulting property damage from the overflow."

70.     Walter Energy responded to National Union on September 12, 2011, and pointed out that, even if the exclusion cited by National Union applied, it would only bar coverage for damages to the actual disposal site rather than all damages arising from an environmental pollution condition that originates or emanates from a disposal site.  Accordingly, at the very

- 13 -

least, coverage existed for offsite property damage and the related clean up, including the clean
up of the unnamed tributary to the Freeman Creek, the Freeman Creek, the North River, and any
other land owned by others.

71.     On September 21, 2011, Nation Union responded to Walter Energy's September
12th letter and continued to deny the claim. National Union argued that the "with respect to"
language contained in the endorsement is "commonly understood to be broad," and that,
therefore, "claims by those owning or controlling offsite property (unnamed tributary to Freeman
Creek, North River and any other land owned by others) are 'with respect to' the site or location
that is the source of the contamination. The 'with respect to' connection is an essential element
of the claims against Walter . . . Even the narrowest of readings of that language would not
support an answer of 'the claims are not with respect to such site or location.'"

72.     In response to this contention, Walter Energy requested any legal authority
supporting National Union's position related to the "with respect to" language.  On October 13,
2011, National Union emailed its support, which was a single citation to Coregis Ins. Co. v.
American Health Foundation, Inc., 241 F.3d 123 (2d Cir. 2001).

73.     National Union's response confirms its unreasonable and unsupported denial of
Walter Energy's claim.  First, this decision does not even interpret a policy like the one sold to
Walter Energy, but instead interprets a directors & officers policy form that is entirely distinct
from the coverage National Union sold to Walter Energy.  In addition to the fact that the case has
no precedential value on a coverage dispute arising under Alabama law, the court in Coregis did
not construe "with respect to" language, but rather "arising out of, based upon or related to"
language in an insolvency exclusion.  See 241 F.3d 123 (2d Cir. 2001).  Finally, National Union
failed to even mention another decision in which this same argument was made by National

- 14 -

Union against another policyholder, and in that case, National Union's argument was rejected as contrary to the policy's wording and intent.

74.     On October 27, 2011, Walter Energy wrote to National Union and explained that the site was not "principally used" for the handling, storage, disposal, dumping, processing or treatment of waste material.

75.     Nevertheless, National Union refused to overturn its coverage determination.

76.     On March 12, 2012, Walter Energy's coverage counsel wrote to National Union in a final attempt to have National Union reconsider its position.  Among other things, it was pointed out that an identical argument made by National Union was rejected by a federal court in 2010, and that National Union had failed to disclose this fact to Walter Energy.  In that case, the United States District Court for the District of Kansas rejected National Union's argument that, because a waste disposal system existed on the location from which an oil spill originated, the entire claim was barred.  See Coffeyville Res. Refining & Mktg., LLC v. Liberty Surplus Ins. Corp., 714 F.Supp.2d 1119, 1157-58 (D. Kan. 2010).

77.     When National Union refused to reconsider its position, Walter Energy initiated this action.

## XI.     CAUSES OF ACTION
### COUNT I
### DECLARATORY JUDGMENT

78.     Walter Energy incorporates by reference the allegations contained in paragraphs 1-77.

79.     As set forth above, National Union sold to Walter Energy the Policy covering, among other things, liabilities arising from the Slurry Spill.

- 15 -

80.     Walter Energy has complied with all terms and conditions of the Policy.

81.     National Union continues to fail to acknowledge its coverage obligations for the Slurry Spill.

82.     As a direct and proximate result of National Union's refusal to acknowledge its coverage obligations, Walter Energy has suffered and will continue to suffer serious harm in an amount in excess of $75,000, exclusive of interest and costs.

83.     An actual and justiciable controversy exists between Walter Energy and National Union regarding the interpretation, application and meaning of the Policy, specifically the Time Element Pollution Endorsement.

84.     Accordingly, Walter Energy is entitled to declaratory judgment of this Court of its rights and of the obligations of the National Union under the Policy.

85.     Declaratory relief from this Court will resolve all outstanding issues between Walter Energy and National Union under the Policies.

        WHEREFORE, pursuant to 28 U.S.C. §§ 2201-02, Walter Energy seeks judgment in its favor as to Count I as follows:

        (a)     The entry of an Order declaring that the Policy provides coverage for costs incurred, and future costs to be incurred, in the clean up and remediation of the Slurry Spill; and

        (b)     The award of such additional relief as the Court deems just and appropriate.

US_ACTIVE-108835155.3-JFHEINNI

## COUNT II

### BREACH OF CONTRACT AGAINST NATIONAL UNION

86.     Walter Energy incorporates by reference the allegations contained in paragraphs 1-85.

87.     Walter Energy has complied with all terms and conditions of the Policy.

88.     Walter Energy has incurred costs in the clean up and remediation of the Slurry Spill.

89.     Costs in the clean up and remediation of the Slurry Spill are covered by the Policy.

90.     Walter Energy has requested and continues to request that National Union perform its obligations under the Policy.

91.     To date, National Union has refused to fulfill its obligations under the Policy to pay for costs incurred in the clean up and remediation of the Slurry Spill.

WHEREFORE, Walter Energy seeks judgment in its favor as to Count II as follows:

(a)     The entry of an award requiring the National Union to pay Walter Energy all monetary damages suffered by Walter Energy caused by National Union's breaches, including, without limitation, compensatory damages, consequential damages, prejudgment interest, post-judgment interest, and attorneys' fees and costs; and

(b)     The award of such additional relief as the Court deems just and appropriate.

- 17 -

## COUNT III

### BAD FAITH

92.     Walter Energy incorporates by reference the allegations contained in paragraphs 1-91.

93.     Alabama courts recognize two causes of action for bad faith: the normal and the abnormal.

94.     Under the abnormal bad faith cause of action, a policyholder may base a bad faith claim against its insurance company on the insurer's reliance on an ambiguous portion of a policy as a basis for denying coverage.

95.     To deny Walter Energy's claim, National Union relies on a section of the Time Element Pollution Endorsement, which either clearly favors coverage for Walter Energy, or is ambiguous.

96.     Moreover, National Union has failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review and breached the contract for insurance coverage when it refused to pay the claim.

97.     National Union acted with more than bad judgment or negligence.  It has acted purposefully, intentionally, maliciously, or with a reckless disregard to its obligations under the Policy.

98.     Indeed, National Union's interpretation is contrary to settled Alabama case law which narrowly construes pollution exclusions.  Instead of interpreting the exclusion in the Time Element Pollution Endorsement "as narrowly as possible to provide maximum coverage for the insured" in accordance with Alabama law, National Union has interpreted the provision as broadly as possible to serve its own financial interests.

US_ACTIVE-108835155.3-JFHEINNI

99.     Moreover, National Union made a nearly identical argument before a different federal court, and that court rejected National Union's argument on the grounds that it was contrary to the policy's wording and intent.  Nevertheless, National Union failed to disclose this decision to Walter Energy and continues to rely on its meritless interpretation of the Policy to deny coverage.

100.     As a result of National Union's bad faith actions, Walter Energy has suffered, and will continue to suffer, substantial damages.

101.     As a result, National Union is liable for compensatory damages, consequential damages, interest, attorneys' fees and costs, and punitive damages.

WHEREFORE, Walter Energy seeks judgment in its favor as to Count III as follows:

(a)     The entry of an award requiring National Union to pay Walter Energy all monetary damages suffered by Walter Energy caused by its breaches, including, without limitation, compensatory damages, consequential damages, prejudgment interest, post-judgment interest, and attorneys' fees and costs;

(b)     The award of punitive damages; and

(c)     The award of such additional relief as the Court deems just and appropriate.

- 19 -

Respectfully submitted,

Date: October 17, 2012

Jarred O. Taylor II
Chris J. Williams
MAYNARD COOPER & GALE, PC
901 Sixth Avenue North
2400 Regions Harbert Plaza
Birmingham, AL 35203
T: (205) 254-1061
F: (205) 254-1999
jtaylor@maynardcooper.com
cwilliams@maynardcooper.com

John N. Ellison (*pro hac vice* to be filed)
Lisa A. Szymanski (*pro hac vice* to be filed)
REED SMITH LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103
T: (215) 851-8100
F: (215) 851-1420
jellison@reedsmith.com
lszymanski@reedsmith.com

*Attorneys for Plaintiffs,*
*Walter Energy Inc. and Jim Walter*
*Resources, Inc.*

US_ACTIVE-108835155.3-JFHEINNI